COLORADO EDUCATION ASSOCI-
ATION and Poudre Education
Association, Petitioners

v.

Wayne RUTT and Paul Marrick,
Respondents.

No. 06SC559.

Supreme Court of Colorado,
En Banc.

May 19, 2008.

Rehearing Denied June 2, 2008.

Isaacson Rosenbaum P.C., Mark G. Grueskin, Blain D. Myhre, Daniel C. Stiles, Denver, Colorado, Attorneys for Petitioners.

Hackstaff Gessler LLC, Scott E. Gessler, Hugh C. Thatcher, Denver, Colorado, Attorneys for Respondents.

Justice BENDER delivered the Opinion of the Court.

## I.  Introduction

We granted certiorari in *Rutt v. Poudre Education Ass'n,* 151 P.3d 585 (Colo.App. 2006), to determine whether the court of appeals correctly reversed the administrative law judge's decision to dismiss Wayne Rutt and Paul Marrick's (collectively, "Rutt") complaint against the Colorado Education Association and Poudre Education Association based on the court of appeals' conclusion that the unions coordinated campaign activities with Bob Bacon's campaign for state senate, and thus made illegal contributions to the campaign in violation of article XXVIII of the Colorado Constitution.[1]

---

[1.] We granted certiorari on these three issues:

1.  Whether the court of appeals erroneously interpreted the term "coordinated with" as used in Colorado Constitution Article XXVIII, sections 2(9) and 5(3), in deciding a question of first impression.

2.  Whether the court of appeals erred in concluding that the Petitioners coordinated their campaign activities with a candidate, under Article XXVIII, sections 2(9) and 5(3) and, therefore, that Petitioners violated the prohibition on labor organizations making contributions to candidate committees (Colorado Constitution Article XXVIII, section 3(4)(a)).

3.  Whether the court of appeals erred in failing to address the application of the "member-

■ This campaign finance case implicates the First Amendment and thus involves an area of heightened political concern. We approach this case with the understanding that campaign finance regulations burden rights protected under the First Amendment, core political speech and association. Our construction and application of these regulations "must give the benefit of any doubt to protecting rather than stifling speech." *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, —— U.S. ——, ——, 127 S.Ct. 2652, 2667, 168 L.Ed.2d 329 (2007).

The primary political activity at issue here is the organization by teachers' union staff members of two "walks"—events for union members to volunteer to distribute campaign literature in support of Bob Bacon's state senate campaign—after the union had voted to support his candidacy. Union staff members organized the walks by preparing plans, maps, and instructions for the volunteers, and by purchasing supplies such as bottled water for the walks. The unions recruited union members to participate in the walks through e-mails, phone calls, letters, fliers, and visits to school campuses. The unions also attempted to recruit members of other local education associations to participate in the walks.

Rutt argues that this activity violated article XXVIII of the Colorado Constitution, which prohibits unions from making campaign contributions and expenditures. He first claims that union payments for items like staff salaries, office supplies, and materials for volunteers were "expenditures" within the definitions of article XXVIII because they constitute "any purchase [or] payment . . . of money by any person for the purpose of expressly advocating the election . . . of a candidate." Colo. Const. art. XXVIII, § 2(8)(a).[2] Alternatively, he argues that these same payments were "contributions" within the definitions of article XXVIII because they constitute either "any payment made to a third party for the benefit of any candidate committee" or "anything of value

given, directly or indirectly, to a candidate for the purpose of promoting the candidate's . . . election." § 2(5)(a)(II), (IV). The unions argue that their activities were protected from regulation under article XXVIII by the membership communication exception in section 2(8)(b)(III) because they constitute "payments by a membership organization for any communication solely to members and their families," and thus that they did not violate the law.

After a hearing, the administrative law judge ruled that the unions did not violate article XXVIII. The ALJ concluded that the membership communication exception applied to exempt most of the unions' challenged activities from regulation as expenditures because the unions communicated only with their members. The ALJ concluded that any contact with voters was accomplished by union member volunteers, not by the union as an entity. With regard to any activity not covered by the membership communication exception, such as phone calls and letters to members of other local education associations, the ALJ found that Rutt had not met his burden of proof to establish that an expenditure was actually made. In addition, the ALJ made findings of fact that the unions did not coordinate their activities with the candidate, that the union members voted to support the candidate, and that the services of the union staff members who organized the events were provided to the union members, not to the candidate. The court of appeals reversed the ALJ's decision, holding that the unions made an illegal contribution because they coordinated their activities with the campaign and therefore gave something of value to the campaign. *Rutt*, 151 P.3d at 592.

Whether payments made by the unions are prohibited as "expenditures" depends upon whether they are exempt from regulation by the membership communication exception as payments for "any communication solely to members and their families." § 2(8)(b)(III). We hold that the membership communication

---

ship exception," where the ALJ concluded that most of the Petitioners' communications were not made to non-members.

**2.** For the remainder of this opinion, provisions of article XXVIII will be referred to by section number only. For example, a citation to § 3(4)(a) refers to Colo. Const. art. XXVIII, § 3(4)(a).

exception to expenditures must be construed broadly to reflect the plain language of this constitutional provision and to satisfy the demands of the First Amendment. We also hold that the membership communication exception as construed applies to most of the unions' activities in this case. To the extent that the challenged union activities are not embraced by this membership communication exception—creating postcards intended to be sent to nonmembers, and sending letters and making phone calls to nonmembers to recruit nonmembers for the walks supporting Bacon—we affirm the ALJ's factual findings that Rutt failed to prove facts that demonstrate that an expenditure was made. Accordingly, we hold that the unions did not make prohibited expenditures in violation of section 3(4)(a).

Turning to whether the unions' activities constitute regulated or prohibited contributions under section 2(5)(a)(II) and (IV), the same union conduct that forms Rutt's claim that the union violated the expenditure prohibition comprises the factual basis of his claim that the unions made prohibited contributions—primarily, the payment of staff salaries for time spent organizing the walks. We hold that the membership communication exception must be extended to and embraced within the definition of "contribution." To hold otherwise nullifies the exception. The same conduct may not be protected by the membership communication exception to expenditures, that is, treated as an exempt expenditure, yet, at the same time, be prohibited as a non-exempt contribution. Such a result would be contrary to the intent of the electorate and constitute an unreasonable and disharmonious application of article XXVIII.

As a second basis to support our construction of the article, we hold that the unions' challenged conduct does not meet the pertinent definitions of a contribution under sections 2(5)(a)(II) and (IV). We acknowledge that the facts may reasonably be viewed in two contradictory ways: one advancing the unions' argument that the salaries were paid for the benefit of the unions and their members and thus were exempt from regulation; and the other advancing Rutt's argument that the payments constituted "payments made to a third party for the benefit of" Bacon or "anything of value given ... indirectly" to Bacon, and thus were prohibited contributions. As the Supreme Court has directed us, when the First Amendment is at issue, the tie goes to the speaker rather than to censorship and regulation. *See Wis. Right to Life*, 127 S.Ct. at 2669. Hence, we hold that on the facts of this case, the unions did not make any prohibited contributions in violation of section 3(4)(a).

Lastly, we conclude that it is not necessary to the resolution of this case to define "coordination" under article XXVIII as the court of appeals did, and thus we leave this issue for another day. Accordingly, we reverse the decision of the court of appeals, which held that the unions made prohibited contributions. We remand this case to the court of appeals with directions to return it to the ALJ for further proceedings on the remaining issue of attorney fees, an issue which was not raised on certiorari.

## II. Facts and Proceedings Below

### A. Facts

During the summer before the November 2004 general election, the members of the Colorado Education Association and the Poudre Education Association voted to support Bob Bacon in his campaign for state senate district 14. Members of the PEA are teachers in the Poudre School District. All members of the PEA are also members of the statewide CEA.

The decision to support Bacon was based on Bacon's support for public education. Bacon served as a school teacher in the Poudre School District for thirty years and was a former member and president of the PEA. After he retired from teaching he served as a member of the Poudre School District school board for eight years, and later, a new elementary school in the district was named after him. As a three-term representative in the state house Bacon had established himself, in the unions' view, as a supporter of public education and public school teachers.

After the unions voted to support Bacon, they organized activities to support his elec-

tion. The primary events were two "walks" during which more than 125 union members volunteered to distribute Bacon campaign literature to homes throughout the community and to talk to potential voters. Four CEA and PEA staff members played a role in organizing these events. All four staff members worked for the unions before these events and continued to work for the unions thereafter. One staff member organized the walks. During the month of October 2004, this CEA staff member worked from the PEA office approximately four days a week, for at least part of the day.

Other staff members recruited volunteers for the walks, including sending e-mails, mailing letters, making phone calls, and visiting schools to meet with PEA members to encourage them to participate in the walks. They also assisted with administrative and clerical aspects of the unions' volunteer recruitment.

These union staff members employed a variety of techniques to recruit union members to volunteer in the walks. They sent postcards, made phone calls, sent e-mails, distributed fliers using Poudre School District's inter-school mail system, held after-school meetings on individual campuses, and asked the union representatives in each building to recruit members to participate in the walks.

The walks occurred on two Saturdays in October prior to the November 2, 2004, general election. The first walk targeted homes in specific precincts that had residents who were registered with the Democratic or Green Party or were unaffiliated. The volunteer walkers were provided with a bag containing Bacon campaign literature, a bottle of water, precinct maps and voter lists[3] that had been prepared by the union's staff, as well as written instructions requesting information about voters.[4] For the second walk, the union staff instructed the volunteers to distribute literature to every home in identified precincts rather than to target spe-

cific homes. The literature and yard signs distributed during the walks were produced and paid for by the Bacon campaign.

At the beginning of each walk, Bacon appeared for five to ten minutes, speaking briefly to thank the volunteers. He then left and had no further involvement. A union staff member told Bacon about the walks.

Before the second walk, union staffers made phone calls and sent letters to members of other education associations inviting them to participate. This included members of the Association of Classified Employees and Poudre Association for School Executives. These individuals were not members of the PEA, but may have been members of the CEA. This activity also included members of other local teacher unions who lived in state senate district 14—for example, a resident of Fort Collins who worked in the Boulder Valley School District. These individuals were not members of the PEA but were members of the CEA and their districts' education associations. There is no evidence concerning how many calls were made, how many letters were sent, or whether members of other associations participated in this walk.

In addition to the walks, in mid-October, the PEA distributed postcards to its members to send to voters in state senate district 14. The postcards were preprinted with the message "I'm voting for Bob Bacon." Union members were asked to address and mail the postcards to voters. The record does not establish who paid for these postcards or whether any of these postcards were actually mailed to voters.

### B. Administrative Law Judge Decision

Rutt filed a complaint with the Colorado Secretary of State in 2005 alleging that the unions illegally contributed to Bacon's campaign. The complaint was referred to an ALJ. After a hearing, the ALJ issued a

---

3. The union purchased the precinct maps from the county clerk, and made copies for the walkers using the PEA's copying machine. The voter lists were complied by a union staff member using information from a voter information database that the CEA had access to. There is no evidence indicating whether the unions paid for this information.

4. There is no evidence that this information was ever provided to the Bacon campaign.

decision dismissing Rutt's claim and resolving all issues in favor of the unions, concluding that the unions made neither prohibited expenditures nor prohibited contributions.

Rutt alleged that the unions committed two types of violations. The first was that the unions made illegal independent expenditures expressly advocating Bacon's election in violation of section 3(4)(a), which prohibits unions from making expenditures. He reasoned that when the unions paid money for postcards, staff salaries, and supplies for the walks, these payments were expenditures because they were "any purchase [or] payment . . . for the purpose of expressly advocating the election or defeat of a candidate." § 2(8)(a).

Secondly, Rutt claimed that the unions' course of conduct in planning and carrying out the walks and other campaign-related activities amounted to a contribution, prohibited by section 3(4)(a), because this conduct represented either "[a] payment made to a third party for the benefit of any candidate committee" or "anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's . . . election." § 2(5)(a)(II), (IV).

Rutt's second claim introduced the issue of "coordination." Although Rutt did not argue specifically that the unions made "coordinated expenditures," he did claim that if there is a showing of coordination between the union and the candidate, then this factual connection established a payment which is "for the benefit" of a candidate, or which is something "of value" given to a candidate. The premise of Rutt's legal theory was that coordinated activity between the union and the candidate necessarily provides a benefit or value to a candidate prohibited as a "contribution."

Rutt further argued that Colorado should adopt the federal definition of coordination, which provides that coordinated communication occurs when a candidate is "materially involved" in the communication's content, intended audience, means or mode, specific media outlet used, timing or frequency, size, prominence, or duration; and when the communication is created, produced, or distributed after substantial discussion between the candidate and the person paying for the communication. *See* 11 C.F.R. § 109.21(d)(2), (3) (2006).

Rutt presented testimony from an expert who estimated that the value of the services provided by the unions to Bacon was $35,000. Based on this testimony, Rutt argued for an approximately five-fold civil penalty of $170,000 against the unions pursuant to section 10(1).[5]

After rejecting Rutt's argument that the unions coordinated their activities with Bacon,[6] the ALJ turned to the question of whether the unions nevertheless made prohibited expenditures or contributions.

For several items that Rutt claimed were independent expenditures, the ALJ found insufficient evidence of cost to establish a violation of article XXVIII. With regard to the postcards prepared by the unions, the ALJ found no evidence that the postcards had

---

5. Section 10(1) provides, "Any person who violates any provision of this article relating to contribution or voluntary spending limits shall be subject to a civil penalty of at least double and up to five times the amount contributed, received, or spent in violation of the applicable provisions of this article."

6. In her discussion, the ALJ first concluded that the unions did not coordinate campaign efforts with Bacon. The ALJ found that there was no evidence that the unions sought Bacon's assent or approval for their activities, or that they coordinated with his campaign prior to the events. She determined that the unions made commitments to their members to work to help Bacon get elected, and that the unions did not make promises or commitments to Bacon. The unions created their own voter lists, precinct maps, vol-

unteer instructions and script, and plan for targeting households without input from Bacon. While the unions did receive campaign fliers and yard signs from Bacon, the ALJ determined that this was not sufficient evidence to show coordination between the unions and Bacon. The ALJ explained that the best evidence that there was no coordination was the fact that the method of voter targeting employed by the unions did not match up with the targeting done by the Bacon campaign. The ALJ also concluded that Bacon's brief presence at the beginning of the walks was not an indication of coordination. While a union staff member informed Bacon that the walks would occur, the ALJ found no credible evidence that the unions sought Bacon's approval for the walks or worked with his campaign to schedule the events.

been sent to nonmembers and therefore, there was insufficient evidence to determine their cost. With regard to contacts made to members of other unions, she found no evidence of any cost associated with these activities.

Concerning Rutt's claim that the unions' conduct in planning the walks and recruiting volunteers constituted an independent expenditure, the ALJ applied the membership communication exception to hold that this conduct was exempt from regulation. The ALJ reasoned that the unions did not engage in communications beyond their membership. Because there was no evidence of the cost of the postcards, whether the postcards were actually sent to nonmembers, or the cost of contacts (i.e., letters and phone calls) to members of other unions, the ALJ ruled that these activities did not constitute proof that an expenditure had been made. Concerning the unions' other activity, such as e-mails and inter-school mail communications, she found insufficient evidence to establish that any communication went to nonmembers. Therefore, she held that all union communications satisfied the membership communication exception.

The ALJ also considered whether the unions' activities constituted a contribution because they were "anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's ... election." § 2(5)(a)(IV). She found as a fact that the CEA staff services Rutt claimed were contributions were actually provided to and for the benefit of the union members and not to Bacon's campaign. Thus, even if the CEA's efforts provided value to Bacon, nothing was given to him, so the "anything of value" definition of contribution was not satisfied.

Alternatively, the ALJ found that the staff services could not be considered contributions because the staff services were part of membership communications. She reasoned that although article XXVIII does not include a membership communication exception for contributions, to allow a prohibition of membership communications would "create a contradictory dilemma" for groups like the CEA and the PEA. She reasoned that

the unions' communications and payments for communications cannot both be excluded from regulation as expenditures, yet at the same time be subject to regulation and prohibition as contributions. In other words, the same conduct cannot be both a protected membership communication and a prohibited contribution. Thus, the ALJ held that the alleged contributions could not be deemed prohibited contributions under section 3(4)(a), irrespective of whether they provided value to the campaign.

The ALJ also concluded that the CEA did not make a contribution under the "payments to a third party" definition. The alleged payments were for staff members' salaries for the time spent on campaign efforts, as well as things like maps, copying expenses, office supplies, refreshments, and office space. Again, the ALJ found as fact that the services were not provided on behalf of Bacon, but rather were provided to and on behalf of union members. Thus, she concluded that staff salaries were not payments to third parties made on behalf of Bacon.

For all of these reasons, the ALJ concluded that neither the CEA nor the PEA made illegal contributions or expenditures expressly advocating Bacon's election; thus, she dismissed Rutt's complaint.

### C. Court of Appeals' Decision

On appeal to the court of appeals, a division of that court reversed the ALJ's decision, holding that the unions coordinated their activities with the Bacon campaign, and that the unions' efforts constituted "[a] thing of value given, directly or indirectly, to a candidate," which constituted a contribution under section 2(5)(a)(IV).

That court reasoned that to avoid a conflict with the First Amendment, a coordination requirement must be read into the definition of contribution. *See Rutt*, 151 P.3d at 589 ("Neither of the two sections defining contribution on which Rutt relies includes the term 'coordination.' However ... a finding of coordination is required to avoid a conflict with the First Amendment.").

Relying primarily on dictionary definitions, the court held that "coordination" means

"harmonious and common effort" and involves "some level of concerted action." *Id.* at 590. The court identified three facts that, in its view, established coordination, or a harmonious and common effort, between the unions and Bacon: (1) the unions received fliers from the Bacon campaign that were produced and paid for by the campaign; (2) Bacon made a personal appearance at each walk to thank volunteers; and (3) a CEA staff member had conversations with Bacon's campaign director in which the staff member described the nature of the unions' volunteer efforts. The court acknowledged that none of these activities alone would be sufficient to show coordination, but when viewed together, they establish that the unions coordinated their efforts with Bacon. *Id.* at 591.

After determining that there was coordination, the court held that this organized effort provided value to Bacon, equivalent to a cash payment that the Bacon campaign could have used to pay for the distribution of its literature. *Id.* at 591–92. Thus, the court of appeals concluded that the unions gave something of value to Bacon. After reaching this conclusion, the court of appeals did not address other arguments advanced by either of the parties: whether the facts constitute "payment to a third party" contributions or independent expenditures, and whether the membership communication exception applies to the unions' activities.

The unions petitioned for certiorari review which we granted.

### III. Analysis

**A. First Amendment Precedent Requires Us to Construe the Membership Communication Exception Broadly to Encompass the Unions' Challenged Activity**

Rutt asserts that the unions engaged in prohibited expenditures by paying staff salaries for time spent organizing the walks and recruiting volunteers, preparing postcards to be sent to nonmembers by members, making phone and mail contact with nonmembers, and buying supplies and materials for the walks. To resolve these claims, we must construe the definition of "expenditure" and the "membership communication exception" to expenditures in article XXVIII consistent with the First Amendment mandates of the United States Supreme Court and the language of the article itself. Initially, we discuss the specific language of the article and then the constitutional precedent. Ultimately, we conclude that First Amendment concerns and the article's language require us to construe the membership communication exception broadly.

Section 3(4)(a) prohibits unions from making contributions to a candidate and from making expenditures that expressly advocate a candidate's election:

> It shall be *unlawful* for a corporation or *labor organization to make contributions to a candidate committee* or a political party, *and to make expenditures expressly advocating the election or defeat of a candidate;* except that a corporation or labor organization may establish a political committee or small donor committee which may accept contributions or dues from employees, officeholders, shareholders, or members.

(Emphasis added).

An "expenditure" includes any purchase or payment for the purpose of expressly advocating a candidate's election:

> "Expenditure" means any purchase, payment, distribution, loan, advance, deposit, or gift of money by any person for the purpose of expressly advocating the election or defeat of a candidate or supporting or opposing a ballot issue or ballot question.

§ 2(8)(a).

An expenditure may be either independent, or controlled by or coordinated with a candidate:

> "Independent expenditure" means an expenditure that is not controlled by or coordinated with any candidate or agent of such candidate. Expenditures that are controlled by or coordinated with a candidate or candidate's agent are deemed to be both contributions by the maker of the

expenditures, and expenditures by the candidate committee.

§ 2(9).

The definition of "expenditure" contains exceptions that exclude some payments from the definition of expenditure. Pertinent here is the membership communication exception, which permits expenditures for communication between membership organizations and their members and families:

> ["Expenditure" does not include] [s]pending by persons, other than political parties, political committees, and small donor committees, in the regular course and scope of their business or *payments by a membership organization for any communication solely to members and their families.*

§ 2(8)(b)(III) (emphasis added). The membership communication exception applies to both independent and coordinated expenditures. In order to have a "coordinated expenditure," there must first be an "expenditure," and there cannot be an "expenditure" if the spending was for member communication. Thus, if an alleged expenditure was for member communication, the existence of coordination is irrelevant.[7]

■ The membership communication exception covers payments by a membership organization for "*any communication*" solely to members and their families. The key phrase, "any communication," is broad and all-inclusive. Given this broad language, we are not free to imply limitations or qualifications that are not found in article XXVIII. *See Colo. State Bd. of Accountancy v. Zaveral Boosalis Raisch*, 960 P.2d 102, 106–07 (Colo.1998) (holding that in the context of the accountant-client privilege, the statutory phrase "any communication" was not susceptible to an implied exception in the absence of an express statutory exception). Based on the plain words of article XXVIII, we conclude that the article provides a broad exception to the regulation of expenditures for union member communications.

■ Consistent with the broad membership communication exception contained in article XXVIII is the precedent of the United States Supreme Court which carefully scrutinizes campaign finance regulations because they interfere with both political speech and association.[8] Campaign spending is a form of speech, because "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Buckley v. Valeo*, 424 U.S. 1, 19, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). Restrictions on "the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression." *Id.* Restrictions on expenditures "operate in an area of the most fundamental First Amendment activities" because they amount to a restriction on political speech. *Id.* at 14, 96 S.Ct. 612. Thus, such limitations on expenditures are subject to "the closest scrutiny." *Id.* at 25, 96 S.Ct. 612 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

■ When dealing with restrictions on campaign spending and speech, a court's construction must "give the benefit of the doubt to speech, not censorship. The First Amendment's command that 'Congress shall make no law ... abridging the freedom of speech'

---

7. It appears that Rutt conceded this point in his answer brief by acknowledging that the membership exception applies to coordinated expenditures. This construction of the exception finds support in federal campaign finance statutes, which permit coordination for membership communications. The analogous provision in the federal statute has been interpreted to mean that even coordinated expenditures for membership communication are exempt from regulation, and thus permitted: "The activities permitted under this section [i.e., communication with members on any subject] may involve election-related coordination with candidates and political committees." 11 C.F.R. § 114.3(a)(1) (2006); *see also* John R. Bolton, *Constitutional Limitations on Restricting Corporate and Union Political Speech*, 22 Ariz. L.Rev. 373, 411–12 (1980) (noting that a union's general treasury funds may be used for communication to "members and their families ... which can be coordinated with a candidate's campaign").

8. We note that a union's political speech enjoys First Amendment protection irrespective of the speaker's identity: "The inherent worth of the speech in terms of its capacity for informing the public does not depend on the identity of the source, whether corporation, association, union, or individual." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978).

demands at least that." *Wis. Right to Life,* 127 S.Ct. at 2674 (omission in original).

■■■■ Just as restrictions on expenditures impinge upon political expression, they also restrain political association, which is equally protected by the First Amendment. *Buckley,* 424 U.S. at 15, 96 S.Ct. 612 ("The First Amendment protects political association as well as political expression."). Restrictions on contributions and expenditures by labor organizations implicate this right because they impose burdens on individuals acting together to amplify their speech. *See* David A. Grossberg, Comment, *The Constitutionality of the Federal Ban on Corporate and Union Campaign Contributions and Expenditures,* 42 U. Chi. L.Rev. 148, 154 (1974) ("Union speech is protected not only because of the [F]irst [A]mendment rights of unions *qua* unions, but also because of the associational rights of the union members.").

■■■■ When the state "impos[es] limitations 'on individuals wishing to band together to advance their views … while placing none on individuals acting alone, [it] is clearly a restraint on the right of association.'" *Eu v. S.F. County Democratic Cent. Comm.,* 489 U.S. 214, 224–25, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) (quoting *Citizens Against Rent Control/Coal. for Fair Housing v. City of Berkeley,* 454 U.S. 290, 296, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)). The guarantee of freedom of association in the political context "protects the right of union members both to express their point of view and to support their position financially." Grossberg, *supra,* at 154. Laws banning union contributions and expenditures impinge upon union members' associational freedom by "preventing

them from supporting candidates collectively through the union." *Id.* at 154–55.

■■■■ The constitutional right of association is linked with the right of free speech and originates from the Supreme Court's recognition that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *Buckley,* 424 U.S. at 15, 96 S.Ct. 612 (quoting *NAACP v. Alabama,* 357 U.S. at 460, 78 S.Ct. 1163).

■■■■ In *Buckley,* the Court held that a ceiling on independent political expenditures by individuals violated the First Amendment because it placed a substantial restraint on the quality and diversity of political speech. *Id.* at 19, 96 S.Ct. 612. The limit on expenditures also severely burdened the freedom of association. *Id.* at 22, 96 S.Ct. 612. A limit on the amount an individual may spend for an independent expenditure would "preclude[ ] most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association." *Id.*[9]

■■■■ Article XXVIII's broad membership communication exception serves to protect both the freedom of speech of the union and the constitutionally protected associational rights of union members by permitting unions to make expenditures for communication with their members, even if the communication expressly advocates a candidate's election.[10]

■■■■ In the arena of the First Amendment, we are bound to give at least equivalent protection to expressive freedoms as

9. Limitations on most corporate expenditures pass strict scrutiny based on the government's compelling interest in regulating corporations, which may attain large profits through the state-conferred benefits of the corporate form. *See Austin v. Mich. Chamber of Commerce,* 494 U.S. 652, 660, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). However, corporations that are more like voluntary political associations may not be prohibited from making expenditures. *See Fed. Election Comm'n v. Mass. Citizens for Life,* 479 U.S. 238, 263, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). The Supreme Court has not ruled on the constitutionality of a prohibition on union expenditures.

10. The United States Supreme Court read the membership communication exception into an earlier federal campaign finance statute, the Federal Corrupt Practices Act, reasoning that if a prohibition on corporate and union contributions and expenditures were construed to prohibit a union from distributing a publication with political messages to its members, "the gravest doubt would arise in our minds as to its constitutionality." *United States v. CIO,* 335 U.S. 106, 121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948).

that which is mandated by the United States Supreme Court's precedent concerning the freedom of speech and the freedom of association.[11] This precedent provides strong protections for both political expenditures and for communication between unions and their members. Thus, we are compelled to interpret and apply the membership communication exception broadly to prevent the suppression of protected speech.

With this broad construction of the membership communication exception in mind, we turn to whether the membership communication exception applies to exempt the unions' activities from regulation as "expenditures."

On appeal, Rutt has not contested the sufficiency of the evidence supporting the following findings of fact: the union members voted to support Bob Bacon's candidacy in state senate district 14; the union staff members provided services to their members; the Bacon campaign was not involved in approving, planning, or organizing the walks; the number of phone calls made or letters sent to members of unions other than the PEA was not established; there was no evidence of the amount spent for any phone calls or letters to members of unions other than the PEA; there was no evidence that postcards were sent to nonmembers; there was no evidence of the cost of the postcards or whether the unions paid for the postcards; e-mails regarding Bacon events were not sent to nonmembers; and union members who walked were unpaid.

■ Rutt contests, as a threshold matter, one finding by the ALJ: that the unions made promises, goals, and commitments to their members to help Bacon get elected, and did not make commitments to Bacon or his campaign. On appellate review, we accept an ALJ's factual findings unless they are clearly erroneous or unsupported by evidence in the record. *See McClellan v. Meyer*, 900 P.2d 24, 29 (Colo.1995) ("A reviewing court may reverse an administrative determination ... [if the decision] is unsupported by

the evidence in the record."). To the extent that this finding is based on the evidence presented before the ALJ, evidentiary conflict alone does not render this finding clearly erroneous or without substantial support. *See Lee v. State Bd. of Dental Exam'rs*, 654 P.2d 839, 844 (Colo.1982) (noting that a "mere conflict" does not render the findings "clearly erroneous" or "without substantial support"). Because our review reveals substantial factual support for this finding, and because Rutt did not raise this issue on certiorari, we affirm the factual basis of this finding.

We next address Rutt's central arguments that the entire course of action by the unions in organizing the walks should be considered as a whole, and that the membership communication exception does not apply because the intent and effect of the walks was to communicate with nonmembers—that is, with the voting public. He argues that to address this claim, we should not analyze piecemeal each individual action by union staff members, but rather we should consider the entirety of the unions' activities.

However, the flaw in this argument lies with the specific terms of the constitutional article's definition of precisely what constitutes an expenditure: an "expenditure" requires a "payment, purchase, distribution, loan, advance, deposit, or gift *of money.*" § 2(8)(a) (emphasis added). Of course, we are bound to follow this definition and its mandate to treat as expenditures only those items for which there is evidence that money has in fact been spent.

■ The ALJ found that Rutt failed to meet his evidentiary burden to prove that union activities were directed to non-union members to elect Bacon. There was no evidence that postcards were sent to nonmembers or that money was spent for the postcards. Concerning the contact with members of other education associations, the ALJ found that there was insufficient evidence to establish how many phone calls

---

11. Our state constitution provides more expansive protection of speech rights than provided by the First Amendment of the United States Constitution and Supreme Court precedent. *See Tattered Cover, Inc. v. City of Thornton*, 44 P.3d

1044, 1054 (Colo.2002). Indeed, Colorado has an "extensive history of affording broader protection under the Colorado Constitution for expressive rights." *Id.*

were made, how many letters were sent, or how much time was spent on these activities; thus, there was no basis for finding that there was any cost or expenditure associated with this activity. Hence, we hold that the ALJ appropriately concluded that Rutt failed to establish that these activities constituted expenditures as defined in section 2(8).

In support of this holding, we note that the contact with nonmembers of the PEA included members of other local teacher unions who were members of the CEA. To the extent that the walks were a joint effort between the two unions, the communications are fairly characterized as protected communication between the CEA and its members.

■ Next, we turn to Rutt's argument that payments for staff salaries constituted prohibited expenditures. We assume without deciding that payments to union staff members constitute an "expenditure"—that is, these payments represent "payments ... of money" made for "the purpose of expressly advocating the election ... of a candidate." § 2(8)(a). Whether these payments are prohibited depends upon whether they are exempt from regulation by the membership communication exception as "payments by a membership organization for any communication solely to members and their families." § 2(8)(b)(III). We hold that they are exempt.

Union members voted to support Bacon's campaign. Bacon was a teacher with thirty years of experience in the Poudre School District, a former union member and PEA president, and a former school board member. He had already served three terms in the state house and established himself there as a supporter of public education. Union members determined that it was in their interest for him to represent them in the state senate.

Union staff members made building visits to hold meetings with members, sent e-mails to members, used the inter-school mail system to send notices to members, and pre-

pared information for members regarding the walks. The CEA and the PEA, as entities, did not communicate with voters or the general public; they communicated with their members. In turn, the union members volunteered to communicate with nonmembers. While it is accurate to say that the unions' organized efforts sought to help elect Bacon, the payments of union staff salaries involved activities communicated to members and their families to promote union purposes.[12] The union staff's efforts were directed toward assisting the union members in promoting their own interests—activities that lie at the very heart of the associational freedoms protected by the membership communication exception.

Construing the membership communication exception broadly, as we must, we hold that payment of regular salary to union staff members falls within the membership communication exception to expenditures under section 2(8)(b)(III). The collective time spent by the unions' paid staff members in this case constitutes communication with the unions' members. Hence, the time spent by the unions' salaried staff does not constitute a prohibited expenditure.

■ Given our conclusion that it was permissible for union staff members to plan the walks and recruit union members to participate, it would make little sense to determine that it was impermissible for the union to provide water, donuts, or walking maps to volunteer participants. We conclude that payments for materials and supplies for the walks are not prohibited expenditures. For these reasons we hold that the challenged union activities do not constitute expenditures in violation of section 3(4)(a) of article XXVIII.

**B. Conduct Protected by the Membership Communication Exception to Expenditures May Not Also Be Prohibited by the Definition of "Contribution"**

■ Having held that the unions did not make any prohibited expenditures, we con-

---

12. We note that the union provided testimony regarding the ways that activities such as the walks also benefit the union, as well as the union members: increasing member participation in union activities; identifying union members with leadership potential; increasing member awareness of the state association; and increasing interaction between union staff and members.

sider whether the same union conduct constitutes a prohibited contribution in violation of section 3(4)(a). We begin our review with article XXVIII's pertinent definitions of contribution. We next turn to a brief discussion of Supreme Court precedent in this area. We address and reject Rutt's challenges for two reasons. First, the intent of the electorate when it passed article XXVIII could not be to approve the identical union activity in one subsection and to prohibit it in another subsection. Identical conduct that the membership communication exception protects, and is therefore not an "expenditure," cannot in the same breath be prohibited as a "contribution." Second, payments made to support the union activities to elect Bacon may be viewed either, as the ALJ concluded, to be for the benefit of the union and its members, or as Rutt argues, indirectly for the benefit of the Bacon campaign. Because contribution regulations impinge upon First Amendment protected rights of core political speech and freedom of association, we must "give the benefit of the doubt to speech, not censorship." *Wis. Right to Life,* 127 S.Ct. at 2674. Hence, we conclude that the challenged union activity does not constitute a prohibited contribution under section 3(4)(a).

Article XXVIII includes four separate definitions of "contribution," only two of which are pertinent here. The first states that a contribution includes *"[a]ny payment* made to a third party *for the benefit of any candidate* committee, issue committee, political committee, small donor committee, or political party." § 2(5)(a)(II) (emphasis added). The second definition of a contribution includes *"anything of value* given, directly or *indirectly,* to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." § 2(5)(a)(IV) (emphasis added).

Unlike the definition of "expenditure," the definition of "contribution" does not contain a membership communication exception. However, it does have a "volunteer exception," which provides that "'contribution' does not include services provided without compensation by individuals volunteering their time on behalf of a candidate." § 2(5)(b). And, parenthetically, we note that

the ALJ concluded that the time spent by union members distributing Bacon campaign literature on these two Saturdays was not a contribution because the union members volunteered for this purpose.

■ Having considered the pertinent language of article XXVIII concerning contributions, we turn to the First Amendment principles that guide us when we apply the article's definitions to determine whether the unions' challenged activities are prohibited. Like restrictions on expenditures, restrictions on contributions are a restraint on core political speech and association. However, the Supreme Court has held that restrictions on contributions place a lesser burden on the First Amendment than do restrictions on expenditures. *Buckley,* 424 U.S. at 23, 96 S.Ct. 612. The Court reasoned that "the quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Id.* at 21, 96 S.Ct. 612. This marginal restriction on speech was justified by the government's interest in limiting corruption and the appearance of corruption, as large campaign contributions may be used to attempt to secure a quid pro quo from a candidate if he is elected. *Id.* at 26–27, 96 S.Ct. 612.

■ The Court has "consistently held that restrictions on contributions require[ ] less compelling justification than restrictions on independent spending" because contributions are a less pure form of political speech and the danger of political corruption establishes a stronger justification for regulation. *Fed. Election Comm'n v. Mass. Citizens for Life,* 479 U.S. 238, 259–60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Nonetheless, a contribution limit must satisfy the "lesser demand of being closely drawn to match a sufficiently important interest." *McConnell v. Fed. Election Comm'n,* 540 U.S. 93, 136, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (internal quotations omitted). Despite this more relaxed constitutional standard, contribution limitations affect core political speech. As such, they "operate in an area of the most fundamental First Amendment activities," *Buckley,* 424 U.S. at 14, 96 S.Ct. 612, and operate

in an area where we "give the benefit of the doubt to speech, not censorship." *Wis. Right to Life*, 127 S.Ct. at 2674.

The same conduct that formed the basis of Rutt's expenditure claims forms the basis for his contribution claims. Rutt argues that the salaries paid to union staff members for the time spent organizing campaign activity, as well as payments to merchants for materials and supplies purchased for these activities, constitute payments made to "third parties" for the benefit of Bacon's campaign. He also argues that the services of the staff members in organizing the walks were "anything of value" given indirectly to Bacon. On the other hand, the unions contend that these activities were not prohibited contributions. They argue that the services were provided to union members for the benefit of the union and its members and thus did not constitute either prohibited payments to third parties or anything of value given indirectly to Bacon.

When applying a provision of a voter-enacted constitutional amendment, we are obligated to give effect to the intent of the electorate that adopted it. *Davidson v. Sandstrom*, 83 P.3d 648, 654–55 (Colo.2004). The inclusion of the membership communication exception to expenditures in article XXVIII indicates that the electorate intended that conduct included within this exception should be exempt from state regulation. To apply the article to allow protected conduct under one provision to be prohibited by a different provision would be contrary to the electorate's intent that this conduct be protected and would thereby render protection a nullity. *See Indus. Claim Appeals Office v. Orth*, 965 P.2d 1246, 1254 (Colo.1998) (when construing different provisions concerning the same topic, "we should avoid a construction that renders any such provision superfluous or a nullity").

In addition, we have a responsibility to construe each provision of article XXVIII in connection with every other provision and with the whole so that the resulting application creates harmony between each part. *Bruce v. City of Colo. Springs*, 129 P.3d 988, 992 (Colo.2006) (noting that when a constitutional amendment is ambiguous, "we interpret constitutional provisions as a whole and attempt to harmonize all of the contained provisions"); *see also Bickel v. City of Boulder*, 885 P.2d 215, 229 (noting that "an unjust, absurd or unreasonable result should be avoided when construing a constitutional provision"). To avoid an unreasonable and disharmonious interpretation of article XXVIII, we may not protect the union's conduct under one provision of the article and in the next breath punish the identical conduct as a contribution under a different provision of the article. Here, the only difference between protected and prohibited conduct would be the label attached to the conduct. Such an application would be an unreasonable application of the article as a whole. As the ALJ noted, this would create a contradictory dilemma for membership organizations such as the CEA and the PEA, which are constitutionally entitled to engage in core political speech to and with their members. Hence, we hold that the membership communication exception must be extended to and embraced within the definition of "contribution."

As a second basis to support our construction of the article, we address Rutt's argument that the unions' entire course of conduct was something of "value" given "indirectly" to the Bacon campaign under section 2(5)(a)(IV). He argues that the unions effectively operated as Bacon's volunteer coordinator, relieving Bacon from paying for these services himself. He introduced testimony that placed the value of the alleged contributions to the Bacon campaign, primarily the value of the staff salaries, at between $35,000 and $38,000. He raises a related argument that the staff salaries and the payments for supplies for the walks constitute "payments made to a third party for the benefit of any candidate committee" under section 2(5)(a)(II).

The ALJ disagreed with these arguments, concluding that the facts supported the conclusion that the unions acted and made payments for their own benefit and for the benefit of their members, not for the benefit of the Bacon campaign. For the same reasons, the ALJ concluded that nothing of value was given indirectly to the Bacon campaign. The

ALJ repeated facts already discussed to support this conclusion.

However, as we view the record, while it may be accurate to say that the challenged union activities were directly provided to union members with the purpose of promoting union interests, it seems similarly accurate to say that the unions' collective activities provided a benefit to the Bacon campaign when thousands of his campaign flyers were distributed to voters throughout the senate district. Thus, Rutt's argument that Bacon's campaign benefited and indirectly received value from the unions' activities and literature distribution rings true.

We have facts that may lead to two reasonable but contradictory conclusions: that the challenged union conduct is either permissible or prohibited under the article's two related definitions of a regulated contribution. To resolve this factual dilemma, we turn to the Supreme Court's mandate that requires us to give the benefit of the doubt to the union's right to core political speech rather than to Rutt's argument that involves censorship and regulation. Hence, applying the Court's mandate, we conclude that neither the unions' payments of staff salaries to organize the walks to distribute Bacon literature, payments for supplies and materials for the walks, nor the unions' course of conduct taken as a whole constitute prohibited contributions under either section 2(5)(a)(II) or section 2(5)(a)(IV). The challenged union activities do not violate section 3(4)(a) of article XXVIII.

■ Next, we address Rutt's argument that a showing of coordination between the unions and Bacon is sufficient to satisfy section 2(5)(a)(II)'s requirement that the challenged conduct is "for the benefit of" a candidate or section 2(5)(a)(IV)'s requirement that the challenged conduct constitutes "anything of value" given to a candidate.

As a factual matter or evidentiary issue, Rutt may be correct that the existence of some level of communication or cooperation helps demonstrate that the alleged contribution resulted in a "benefit" or "value" to the candidate. The obvious factual assumption here is that if the candidate coordinates the activity with the contributor the activity has some value to his election.

In this case, the evidence reveals limited involvement by Bacon in the unions' activities: conversations between union staff and Bacon campaign staff, Bacon's brief appearance at the walks,[13] and the use of Bacon's campaign literature during the walks. However, the facts that may show a limited amount of coordination do not change the essential factual dilemma we discuss: when considered in light of all the evidence, this limited coordination may be viewed as supporting the unions' argument that all the conduct, including the limited involvement of Bacon, constitutes a benefit solely to the union members. On the other hand, this same conduct may be viewed as something of indirect value to Bacon's campaign. Both factual theories are reasonable given the evidence presented in this case. Both evidentiary interpretations lead to contrary conclusions: one for exemption and the other for regulation. Again, we must give the benefit of the doubt to core political speech rather than to censorship. Thus, we reject Rutt's argument that this limited factual showing of coordination demonstrates a contribution under sections 2(5)(a)(II) or (IV).

■ As part of Rutt's argument that coordination occurred, he urges us to do more than consider coordination as a factual or evidentiary matter. He urges us to interpret, as a matter of law, the specific constitutional term "coordinated," as did the court of appeals. However, we conclude that it is not necessary for us to reach this issue in this case. The term "coordinated" appears in article XXVIII in only one context: coordinated expenditures. *See* §§ 2(9) & 5(3) (explaining that expenditures that are "controlled by or coordinated with" a candidate are treated as contributions to the candidate). The term "coordinated" is not included in the definitions of contribution in sections 2(5)(a)(II) and (IV) upon which Rutt

---

**13.** While article XXVIII does not address this, we note that the federal campaign finance regulations specifically permit a candidate's appearance at a meeting or function of a labor organization without violating the prohibition on union contributions. 11 C.F.R. § 114.3(c)(2)(i) (2006).

relies. Rutt did not argue that the unions made "coordinated expenditures." Because Rutt did not raise this claim and because the term is not included in the claims that he did raise we do not address this claim.

Lastly, we note that to resolve this case we need not impose a requirement of coordination on the definition of contribution to satisfy First Amendment requirements, as the court of appeals did. The Supreme Court's case law makes a distinction between coordinated and independent expenditures, but makes no similar distinction when it comes to contributions. *Buckley*, 424 U.S. at 46–47, 96 S.Ct. 612. The parties raise the concern that when contributions are made without the direct involvement of a candidate under the definitions in section 2(5)(a)(II), payments "made to a third party for the benefit of any candidate committee," and section 2(5)(a)(IV), "anything of value given, directly or indirectly to a candidate," the recipient of a contribution may be penalized for receiving a prohibited contribution even if the candidate was not aware the contribution was being made.[14] While a finding of coordination may be necessary to protect the recipient of an indirect contribution from unwittingly violating article XXVIII, that issue is not raised by this case. Rutt brought a claim only against the makers of contributions. Because coordination, as a concept or as a matter of law, is not required to protect the rights of the maker of a contribution under the circumstances of this case, we do not construe this term as it relates to article XXVIII.

## IV. Conclusion

For all of these reasons, we reverse the decision of the court of appeals. We remand this case to the court of appeals with directions to return it to the ALJ for further proceedings on the remaining issue of attorney fees.

Justice COATS dissents, Justice EID joins in the dissent.

Justice EID dissents, Justice COATS joins in the dissent.

Justice COATS, dissenting.

Although I too consider it unnecessary to reach the question of coordinated contributions, for me (unlike the majority) this is so because the conduct challenged here is so clearly a prohibited political expense, without reference to campaign contributions. Because I believe the CEA's and PEA's conduct in this case not only falls within the prohibition of article XXVIII, but actually lies at its heart; and because I believe the majority's construction virtually stands the unambiguous language of this constitutional provision on its head, I respectfully write in dissent.

The length and circuity of the majority's explanation make it difficult to concisely develop both my methodological and substantive objections, but my fundamental objection is easily identified. Basically, the majority lights upon a caveat in the article's definition of "expenditure," which is clearly included to ensure that any expenses incurred by a union in communicating with its own membership not be erroneously accounted a political expenditure, and it transforms that caveat into an "exception," or "protection," for partisan political campaign activities by paid union staff, as long as any direct contact with potential voters is left to union volunteers. In addition to finding no support in the actual language of the provision, the majority's "exception" virtually swallows the proscription itself, converting words of prohibition into a license for union campaigning.

Article XXVIII is, of course, structured upon the distinction between political expenditures and campaign contributions articulated in *Buckley v. Valeo*. *See* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). While contributions and *coordinated* expenditures (which for all intents and purposes are contributions) may be constitutionally regulated, *id.* at 28, 96 S.Ct. 612, political expenditures by individuals are strictly protected by the First Amendment. *Id.* at 51, 96 S.Ct. 612. In clear reliance on a further distinction in Supreme Court jurisprudence between the

---

**14.** Some sections of article XXVIII provide penalties for both the maker and the recipient of a contribution. For example, section 3(1) provides

that no person shall make, and no candidate shall accept, contributions in excess of specified limits.

conduct of individuals and that of membership organizations, however, article XXVIII forbids both contributions and expenditures, of all kinds, by labor unions and corporations advocating the election or defeat of a candidate. *See* Colo. Const. art. XXVIII, § 3(4)(a). And although there may be no litigated Supreme Court case precisely upholding a ban on uncoordinated political expenditures by labor unions, that is the clear implication of its applicable jurisprudence, and the majority does not hold otherwise. *See, e.g., Fed. Election Comm'n v. Mass. Citizens for Life,* 479 U.S. 238, 264, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (recognizing shareholders' claims to assets and earnings as factor in assessing validity of prohibiting political expenditures by membership organizations); *Fed. Election Comm'n v. Nat'l Right to Work Comm.,* 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982) (allowing protection of corporate investors by prohibiting use of investment funds to support political candidates); *cf. Pipefitters Local 562 v. United States,* 407 U.S. 385, 414–15, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) (permitting corporations and labor organizations to make contributions and expenditures from voluntary donations of stockholders or union members, which adequately protects payments into the general treasury by dissenting stockholders and union members).

Instead, the majority merely notes that the constitutionality of such a proscription remains an open question and avoids addressing it by finding that the political activities engaged in by paid CEA and PEA staff in this case do not constitute expenditures at all—coordinated or otherwise. That even the majority understands the difficulty of finding its "broad exception" in the language of the caveat seems clear enough from its herculean efforts at justification through presumption and its imputation of the same exception to campaign contributions, without the barest hint of textual support.

The majority's house of cards rests on these few words: " 'Expenditure' does not include ... payments by a membership organization for any communication solely to members and their families." *See* Colo. Const. art. XXVIII, § 2(8)(b)(III). Despite the article's definition of "expenditure" as including any "payment ... for the purpose of expressly advocating the election or defeat of a candidate," *see id.* at § 2(8)(a); its proscriptive provision making it "unlawful for ... a labor organization to make ... expenditures expressly advocating the election or defeat of a candidate," *see id.* at § 3(4)(a); and its separate allowance of the creation of political or small donor committees to shield the dues of union members from being used to subsidize political causes of which they may not approve, *see id.*; the majority nevertheless excuses the use of general union funds to organize, administer, and supervise campaign efforts, including acquiring and providing partisan campaign materials for distribution by union members, as merely "communicating" with its membership. Surely there can be no serious doubt that these are precisely the kinds of expenditures by membership organizations the constitutional provision was designed to prohibit.

It is, of course, the use of salaried employees, rather than de minimus expenses for water and the like, that is at issue here. By exempting the union activities in this case from the article's prohibition of expenditures by membership organizations, the majority necessarily gives its blessing to these kinds of partisan campaign efforts by paid union staff, even if those efforts are clearly coordinated with political candidates. For my part, I am quite convinced that article XXVIII's proscription of all political expenditures by unions and corporations comports with the dictates of the First Amendment. If the majority doubts this proposition, it should strike down article XXVIII as a violation of the Supremacy Clause rather than simply rewriting it.

Because I believe the majority's construction of article XXVIII needlessly nullifies the expressed intent of the voters, I respectfully dissent.

I am authorized to state that JUSTICE EID joins in this dissent.

Justice EID, dissenting.

I agree with Justice Coats that the salaries paid to union staff members to organize campaign events do not fall within the member-

ship communication exception, and I join his dissent. I write separately to point out why I believe the majority's First Amendment analysis is flawed.

Since the 1970s, the United States Supreme Court has recognized that campaign contributions by, and expenditures from, union general funds can be significantly restricted when there are adequate alternative avenues for speech through the use of segregated funds. In a trilogy of cases, the Court identified the concerns that inhere in union-sponsored campaign activities. *See Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 401, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972) (upholding a union's right to establish a political fund for campaign activities) [hereinafter *Pipefitters*]; *United States v. Int'l Union United Auto., Aircraft & Agric. Implement Workers of Am.*, 352 U.S. 567, 591–92, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957) (discussing a union's right to sponsor political ads); *United States v. CIO*, 335 U.S. 106, 123, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948) (upholding a union's right to endorse a candidate in the union's newspaper). On the one hand, unions have a First Amendment right to engage in political speech, including contributing to political campaigns. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 205–07, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (discussing the First Amendment's application to corporate and union political speech); *CIO*, 335 U.S. at 121, 68 S.Ct. 1349 (stating that the prohibition of a union's use of voluntary political funds would raise grave constitutional concerns). On the other hand, there is a danger that unions will use funds from their members to further political agendas with which some members disagree. *See McConnell*, 540 U.S. at 204, 124 S.Ct. 619 (discussing the potential for misuse of general funds); *Pipefitters*, 407 U.S. at 414–15, 92 S.Ct. 2247 ("The dominant concern in requiring that contributions be voluntary was, after all, to protect the dissenting stockholder or union member."); *CIO*, 335 U.S. at 115, 68 S.Ct. 1349 (recognizing Congress' belief "that it was unfair to individual union members to permit the union leadership to make contributions from general funds to a political party which the individual member might oppose").

The balance, according to the Court, may be struck by requiring unions to set up segregated funds to pay for campaign activities. *See Pipefitters*, 407 U.S. at 414, 92 S.Ct. 2247; *see also McConnell*, 540 U.S. at 203, 124 S.Ct. 619. Member contributions to segregated funds are voluntary, and the funds are maintained separately from the unions' general funds. *See Pipefitters*, 407 U.S. at 414–15, 92 S.Ct. 2247. Thus, segregated funds ensure that unions will pay for campaign activities with money that their members voluntarily contribute for that purpose. *See id.*

An exception to this segregated-funds scheme is the so-called membership communication exception, which finds its roots in the Supreme Court's decision in *United States v. CIO*. In that case, a union used general funds to distribute a newsletter to its members for the purpose of advocating the election of a particular candidate. *CIO*, 335 U.S. at 108, 68 S.Ct. 1349. The Court concluded that, given First Amendment concerns, it would not interpret a statute to prevent a union from using general funds to communicate campaign messages to union members. *Id.* at 121, 68 S.Ct. 1349; *see also Pipefitters*, 407 U.S. at 431 n. 42, 92 S.Ct. 2247 ("If an organization ... believes that certain candidates pose a threat to its well-being or the well-being of its members or stockholders, it should be able to get its views to those members or stockholders.... Both union members and stockholders have the right to expect this expert guidance." (citation and quotation omitted)).

Following the Supreme Court's lead, Congress has generally barred the use of general funds for campaign expenditures and contributions. *See* 2 U.S.C. § 441b(a) (2006); *see also* 11 C.F.R. § 114.2(b) (2007). Also following the Court's lead, it has made an exception to this bar for membership communications. *See* 2 U.S.C. § 441b(b)(2); *see also* 11 C.F.R. § 114.3 (2007). Finally, it has authorized the use of segregated funds for union-sponsored campaigning. Officially defined as a type of political committee, *see* 2 U.S.C. § 431(4)(B) (2006), segregated funds may be established and "utilized for political

purposes by a ... labor organization." 2 U.S.C. § 441b(b)(2). Any member contributions must be voluntary, and members must be informed "of the political purposes of such fund." 2 U.S.C. § 441b(b)(3); *see also* 11 C.F.R. § 114.5 (2007).

Significantly, the Supreme Court has found that the segregated-funds scheme provides an adequate alternative for a union to engage in campaign speech. In a recent decision, it stated that "[t]he ability to form and administer separate segregated funds ... has provided corporations and unions with a constitutionally sufficient opportunity to engage in express advocacy." *McConnell,* 540 U.S. at 203, 124 S.Ct. 619.

Article XXVIII of the Colorado Constitution mirrors the federal segregated-funds scheme. For the most part, unions cannot use general funds to make political contributions or expenditures. Colo. Const. art. XXVIII, § 3(4)(a) ("It shall be unlawful for a corporation or labor organization to make contributions to a candidate committee or a political party, and to make expenditures expressly advocating the election or defeat of a candidate[.]"). They may, however, "establish a political committee or small donor committee [1] which may accept contributions or dues from employees ... or members." *Id.* Also, the General Assembly has explicitly authorized political committees to "receive and accept moneys contributed ... by a corporation or labor organization" and to disburse those moneys "to a candidate committee or political party." § 1–45–103.7(2), C.R.S. (2007). Finally, Colorado has adopted the membership communication exception. *See* Colo. Const. art. XXVIII, § 2(8)(b)(III).

The Colorado membership communication exception applies only to communications made "solely" to members. *Id.* As Justice Coats points out, the campaign activities in question in this case were not targeted "solely" to members; instead, the union's efforts were specifically designed to reach nonmembers. The majority's mistake is finding that the exception must be broadly construed to comport with the dictates of the First

Amendment. Maj. op. at 77 ("[W]e are compelled to interpret and apply the membership communication exception broadly to prevent the suppression of protected speech."). Yet the reason that the membership communication exception can be read consistent with its language—that is, narrowly—is that there are adequate alternatives for union expression through the use of segregated funds. Given the dictates of the First Amendment and the explicit authorization of article XXVIII, the campaign activities engaged in by the union staff members in this case could have been paid for with segregated funds. Here, however, the question is whether the activities could be paid for with general funds. They could not: first, because they were directed toward nonmembers and consequently fell outside the protection of article XXVIII's membership communication exception; and second, because under Supreme Court case law, the First Amendment permits the requirement that unions use segregated funds to pay for campaign activities directed toward nonmembers.

To state the flaw in the majority's reasoning somewhat differently, the question is not whether the First Amendment allows the union to conduct the challenged campaign activities *at all. See, e.g.,* maj. op. at 75–76 (noting that campaign finance restrictions infringe protected speech); *id.* at 78 (stating that the union's activities lie at the heart of associational freedom); *id.* at 79 ("[C]ontribution regulations infringe upon First Amendment protected rights of core political speech ...."). If that were indeed the question, I would agree that the membership communication exception should be read broadly. *See Fed. Election Comm'n v. Wis. Right to Life, Inc.,* —— U.S. ——, ——, 127 S.Ct. 2652, 2674, 168 L.Ed.2d 329 (2007) (stating that the court must "give the benefit of the doubt to speech, not censorship"); maj. op. at 75–76 (citing *Wis. Right to Life* ). Rather, as noted above, the question is whether the campaign activities could be paid

1. A small donor committee is "any political committee that has accepted contributions only from natural persons who each contributed no more than fifty dollars in the aggregate per year." Colo. Const. art. XXVIII, § 2(14)(a).

for with general funds, or whether segregated funds should have been used instead.

By refusing to apply the membership communication exception as written to the union's campaign activities, today's opinion essentially finds Colorado's segregated-funds scheme to be unconstitutional as applied to the facts of this case. Yet, as noted above, the United States Supreme Court has found that the federal segregated-funds scheme, upon which Colorado's scheme is based, provides constitutionally adequate alternatives for union-sponsored campaign speech. While the majority suggests that the Colorado Constitution provides for greater free speech protection than the federal constitution, maj. op. at 77 n. 11, article XXVIII amends, and is now part of, the Colorado Constitution. I can see no reason to question the constitutionality of Colorado's segregated-funds scheme, and thus no reason to read the membership communication exception so broadly that it swallows the prohibition on union contributions and expenditures. Accordingly, I respectfully dissent.

I am authorized to state that JUSTICE COATS joins in this dissent.