2015 COA 61

Julie KEIM, Complainant–Appellee;

v.

DOUGLAS COUNTY SCHOOL
DISTRICT, Respondent–
Appellant.

Court of Appeals No. 14CA0268

Colorado Court of Appeals,
Div. I.

Announced May 7, 2015

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2014.

Fairfield and Woods, P.C., Craig D. Joyce, Lee Katherine Goldstein, Denver, Colorado, for Complainant–Appellee

Brownstein Hyatt Farber Schreck, LLP, Jason R. Dunn, Denver, Colorado, for Respondent–Appellant

Luis Toro, Margaret Perl, Denver, Colorado, for Amicus Curiae Colorado Ethics Watch

Lewis Roca Rothgerber, LLP, Eric V. Hall, Brent R. Owen, for Amici Curiae Colorado Counties Incorporated and the City of Arvada

Opinion by JUDGE GABRIEL

¶ 1 In this campaign finance dispute, respondent, Douglas County School District (the District), appeals the final agency decision of an administrative law judge (ALJ). The ALJ found that the District violated Colorado's Fair Campaign Practices Act (FCPA), § 1–45–117(1)(a)(I), C.R.S.2014, when it contracted for and disseminated a report by Dr. Frederick M. Hess and Max Eden of the American Enterprise Institute

(the Hess Report). We conclude that the Hess Report was not given, directly or indirectly, to any candidate for the purpose of promoting that candidate's election. Accordingly, we further conclude that the dissemination of the Hess Report did not constitute a "contribution" under, and the District therefore did not violate, the FCPA in this case. We thus reverse the ALJ's order.

## I. Background

¶ 2 The District is a political subdivision of the state and is therefore subject to the FCPA. *See Taxpayers for Pub. Educ. v. Douglas Cnty. Sch. Dist.*, 2013 COA 20, ¶ 37, 356 P.3d 833 (*cert. granted* Mar. 17, 2014); § 1–45–117(1)(a)(I).

¶ 3 According to petitioner, Julie Keim, beginning with the school board election of 2009, the District began implementing what has been referred to as a "reform" agenda, and after the 2011 school board election, all seven members of the Douglas County School Board (the Board) supported this agenda, as did the District's then newly appointed superintendent, Dr. Elizabeth Celania–Fagen. Keim was a candidate for one of four open positions on the Board in the November 2013 election.

¶ 4 On February 6, 2013, the District signed an Independent Contractor Agreement with the American Enterprise Institute (AEI). This agreement (the AEI Agreement) provided that AEI would "research, create, and publicize" a white paper that ultimately became the Hess Report. At the time the AEI Agreement was signed, no one had declared that he or she would be a candidate for any of the Board seats that would be open in the 2013 election. Moreover, the AEI Agreement provided that it would terminate on December 31, 2013, unless the required services were completed or the Agreement was terminated by either party, thereby suggesting that the white paper was not required to be completed until almost two months after the 2013 election.

¶ 5 The AEI Agreement's "Scope of Services" stated that the white paper would:

a. Describe Douglas County, the school system, and Superintendent Fagen's background and expertise.

b. Describe some of the problems that Douglas County's efforts are meant to address.

c. Describe what Douglas County is doing in terms of curriculum, instruction, programs, systems in place, etc.

d. Explain how this is new and different; describe some of the advantages of the model.

e. Delineate some of the challenges Douglas County faces based on this model.

f. Explain lessons learned from the model.

¶ 6 The District agreed to pay AEI $30,000, inclusive of expenses, to complete its work under the AEI Agreement. Ultimately, the District paid $15,000 of this sum, with the remainder being paid by the Douglas County School District Foundation. The amount paid by the District was funded by a grant that the District had received from the Daniels Fund.

¶ 7 Hess and his research assistant, Eden, undertook the tasks required by the AEI Agreement, and the record reflects that their work was not intended to be a wholly independent review and evaluation of the District. Rather, Hess and Eden worked with the District to provide a report that the District would ultimately review and approve.

¶ 8 Toward that end, in advance of a trip to Colorado to collect information, Eden wrote to the District's Community Relations Officer:

Ideally we would love for you all to help us help you. We can touch base on this as the date draws closer, but we would prefer not to go out there with a blank slate. Rather, we would prefer it if you would tell us what you want us to focus on, what is most worthy of attention, what you'd like to see written about and what your general angle on it (and the paper) is. This is just something to flag to Dr. Fagen so she can mull it over a bit. Perhaps all of the interviews are already lined up with a certain focus in mind, but if not we encourage you to tailor our time out there to directed interviews with folks that you want to

make a particular point of in us meeting and writing about them.

¶ 9 Likewise, AEI provided a draft version of the report to the District on July 31, 2013, and a significant number of changes were made thereafter, with at least some of these changes being requested by representatives of the District.

¶ 10 In the weeks just prior to the release of the completed Hess Report, Eden asked the District's Community Relations Officer to obtain a quote from Superintendent Fagen about how important the then-upcoming school board election was. This quote was to accompany the release of the Hess Report, although the quote was to be included in an op-ed to be placed by Hess in an online periodical, not in the Hess Report itself. Superintendent Fagen did not ultimately provide such a quote, but the president of the Board did. His quote read, "The teachers' union would like to return to the days of big payouts for union officers, ... ending choice for students, and rewarding bad performance. This election presents a clear choice between union interests versus what is best for our students."

¶ 11 The District received the final version of the Hess Report in September 2013. For present purposes, several portions of the Report are pertinent:

- The introduction to the Hess Report indicated that it would provide (1) "a look at the ambitious reform effort" in Douglas County, which county the Hess Report described as a "Republican bastion"; (2) "a case study examining cage-busting leaders seeking to reimagine schools and school systems"; and (3) "a chance to see a vision of unconventional, bold leadership in practice." The introduction further noted, however, that the Hess Report was not intended as an evaluation or endorsement of the Douglas County effort.
- The Hess Report described the reform agenda as (1) "perhaps the nation's boldest attempt at suburban school reform"; (2) "unusually ambitious"; (3) "remarkable in the annals of contemporary school reform"; (4) "radically dif-

ferent"; and (5) "remarkable and illuminating."

- A section of the Hess Report entitled, "Electing a Reform Board," described the history of the then-existing Board and the appointment of Superintendent Fagen.
- The Hess Report contained brief biographical profiles of the existing Board members.
- The Hess Report observed that Douglas County was "a compelling illustration of how a unified board majority can fuel rapid, ambitious reform" and noted that the Board's "cohesion" and "focus" were striking.
- The Hess Report referenced the upcoming school board election and noted the rumors that the American Federation of Teachers might spend substantial sums to defeat the incumbents who were running for re-election.

¶ 12 On September 18, 2013, the District included an Internet link to the Hess Report in its weekly e-newsletter, which reached approximately 85,000 Douglas County residents. Referring to the Hess Report, the newsletter stated, "Hess and Eden point out that districts undergoing significant school reform transform from poor to passable, Douglas County's distinctive aim to going [sic] from good to great. The paper focuses on Douglas County reforms including choice and pay for performance."

¶ 13 Shortly after the District disseminated the Hess Report, Keim filed the current action, ultimately alleging, as pertinent here, that (1) the District had used public resources "to support a slate of candidates running for school board in violation of the FCPA"; and (2) District resources were used in the "research, compilation, preparation and dissemination" of the Hess Report, and the Hess Report was "political in nature, supportive of the platform advocated by the Reform Slate [of Board candidates], and being used to influence the outcome of the election."

¶ 14 In its answer to Keim's amended complaint, the District admitted that District resources were used to fund the Hess Report

but denied that the Hess Report was political in nature.

¶ 15 The matter ultimately proceeded to a two-day trial before the ALJ. The ALJ subsequently issued a final agency decision finding that (1) the Hess Report "overall painted a positive picture of the reform agenda" and "touted the benefits of having a unified board to advance the reform agenda"; (2) the Hess Report "was commissioned and published as a means to support ... the reform agenda and any candidates who would further that agenda"; and (3) "the District spent public funds to influence the outcome of the Board election when it commissioned and paid $15,000 for the Hess Report." Based on these findings, the ALJ concluded that by contracting for and disseminating the Hess Report, the District had made a contribution in violation of the FCPA.

¶ 16 The District now appeals.

## II. Standard of Review

¶ 17 When, as here, judicial review of agency action is directed to this court, we apply the standard of review set forth in section 24–4–106(7), C.R.S. 2014. See § 24–4–106(11)(e).

¶ 18 Section 24–4–106(7) provides, in pertinent part:

> If the court finds no error, it shall affirm the agency action. If it finds that the agency action is arbitrary or capricious, a denial of statutory right, contrary to constitutional right, power, privilege, or immunity, in excess of statutory jurisdiction, authority, purposes, or limitations, not in accord with the procedures or procedural limitations of this article or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, based upon findings of fact that are clearly erroneous on the whole record, unsupported by substantial evidence when the record is considered as a whole, or otherwise contrary to law, then the court shall hold unlawful and set aside the agency action and ... afford such other relief as may be appropriate. In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party.

¶ 19 A reviewing court must give deference to the reasonable interpretations of the administrative agency authorized to enforce a statute. *Colo. Ethics Watch v. City & Cnty. of Broomfield*, 203 P.3d 623, 624 (Colo.App.2009) (*City & Cnty. of Broomfield*). The agency's statutory construction, however, is not binding on an appellate court. *Id.*

¶ 20 In addition, in construing a constitutional provision, we must give effect to the intent of the electorate that adopted it. *Colo. Ethics Watch v. Senate Majority Fund, LLC*, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253 (*Senate Majority Fund*). We look to the words used, reading them in context and according them their plain and ordinary meanings. *Harwood v. Senate Majority Fund, LLC*, 141 P.3d 962, 964 (Colo.App. 2006). If the language of an amendment is clear and unambiguous, then we must enforce it as written. *Senate Majority Fund*, 269 P.3d at 1254. If, however, the amendment's language is susceptible of multiple reasonable interpretations, then we must construe the amendment in light of the objective sought to be achieved and the mischief sought to be avoided by the amendment. *Id.*

¶ 21 We must also avoid interpretations that lead to unjust, absurd, or unreasonable results. *Huber v. Colo. Mining Ass'n*, 264 P.3d 884, 889 (Colo.2011). In addition, in construing a constitutional provision, we presume that each clause and sentence has a purpose, and we must avoid a construction that renders any portion of the provision superfluous. *See People v. Rodriguez*, 112 P.3d 693, 697 (Colo.2005) (noting that appellate courts presume that each phrase of the constitution was included for a purpose and thus reading a constitutional provision to imply a particular requirement because interpreting the provision otherwise would render a portion of it superfluous); *In re Great Outdoors Colo. Trust Fund*, 913 P.2d 533, 542 (Colo.1996) ("[I]n construing constitutional language, each clause and sentence must be presumed to have purpose and use...... Courts must lean in favor of a construction that will render every word op-

erative, rather than one that may make some words idle and nugatory.").

### III. "Contribution" Under Colorado's Campaign Finance Laws

¶ 22 The District contends that because the Hess Report did not constitute a "contribution" as defined by applicable law, the ALJ erred in concluding that the District violated the FCPA. We agree.

### A. Applicable Law

¶ 23 The FCPA prohibits political subdivisions like the District from making "any contribution in campaigns involving the nomination, retention, or election of any person to any public office." § 1–45–117(1)(a)(I). The term "contribution," as used in the FCPA, has the same meaning as set forth in section 2(5) of article XXVIII of the Colorado Constitution. *See* § 1–45–103(6)(a), C.R.S. 2014.

¶ 24 Section 2(5) provides, in pertinent part:

(a) "Contribution" means:

. . .

(II) Any payment made to a third party for the benefit of any candidate committee, issue committee, political committee, small donor committee, or political party;

. . .

(IV) Anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election.

### B. Preliminary Matters

¶ 25 Before proceeding to our analysis of the issues before us, we address three preliminary matters.

■ ¶ 26 First, we reject the District's contention that it did not make a contribution because no public funds or resources were used in connection with the Hess Report.

¶ 27 As noted above, in its answer to Keim's amended complaint, the District admitted that District resources were used to fund the Hess Report, and parties are bound by such admissions in their pleadings. *See Emrich v. Joyce's Submarine Sandwiches, Inc.*, 751 P.2d 651, 652 (Colo.App.1987).

¶ 28 Likewise, in his opening statement at trial, the District's counsel stated:

[Y]es, the School District paid for half the cost of the Hess paper. That paper was, I believe, $30,000. And the School District paid for half of that. . . . [T]he School District is not claiming that these were independent, third-party research papers done, unbeknownst to the District.

They readily admitted that they paid for half the Hess paper. And they'll readily admit that they worked with the researchers to provide them information about the District, and to make staff available to the researchers.

¶ 29 And the District's in-house legal counsel testified that the funds used to pay for the Hess Report were public funds, even if they had previously been supplied to the District by the Daniels Fund.

¶ 30 Accordingly, we perceive no error in the ALJ's factual finding that the District had paid for the Hess Report with public funds.

■ ¶ 31 Second, to the extent that Keim suggests on appeal that the definition of the term "contribution" contained in section 2(5)(a)(II) of article XXVIII of the Colorado Constitution somehow applies here, her argument, which she did not assert below, is unpersuasive. Although we may affirm a trial court's ruling on any ground that is supported by the record, *see Premier Members Fed. Credit Union v. Block*, 2013 COA 128, ¶ 9, 312 P.3d 276, 278, there was no evidence in the record that the District made a payment to a third party for the benefit of any candidate committee, issue committee, political committee, small donor committee, or political party. Accordingly, section 2(5)(a)(II) is inapplicable.

¶ 32 Third, we feel compelled to comment on the tone of the District's appellate briefs. In its briefs, the District referred to Keim's arguments as "nonsensical"; accused her of "subtle mischaracterization," "wholesale mischaracterization," and "blatantly misleading" the court; described its reaction to certain of Keim's arguments with inflammatory (or perhaps sarcastic) language like "dumbfounded";

and even referred to certain of the ALJ's findings in a derisive way. These kinds of personal attacks and serious accusations were inappropriate and unfounded. Disagreement—even vehement and vigorous disagreement—with a trial court's rulings and with the arguments of an opposing party and counsel are, of course, part and parcel of any litigation matter. Nonetheless, we expect such disagreements to be civil and respectful. The use of rhetoric like that cited above is unpersuasive and unhelpful. *See Martin v. Essrig,* 277 P.3d 857, 860 & app'x (Colo. App. 2011).

### C. Discussion

¶ 33 As noted above, and as pertinent here, a "contribution" is defined as "[a]nything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." Colo. Const. art. XXVIII, § 2(5)(a)(IV). This case turns on the meaning of "given, directly or indirectly, to a candidate." *Id.*

¶ 34 We begin with the plain and ordinary meanings of the words used. *See Harwood,* 141 P.3d at 964. The term "give" means "to put into the possession of another for his use." *Webster's Third New International Dictionary* 959 (2002). "To" is "a function word to indicate the receiver of an action or the one for which something is done or exists." *Id.* at 2401. "Indirect" is defined as "not proceeding straight from one point to another." *Id.* at 1151.

¶ 35 In addition, although our constitution does not define the term "indirectly" in the context of campaign contributions, an analogous federal statute provides an example of an "indirect contribution" that is fully consistent with the plain meaning of those terms:

> [A]ll contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate.

52 U.S.C.A. § 30116(a)(8) (West 2014); *see also Buckley v. Valeo,* 424 U.S. 1, 23–24, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) ("The $1,000 [contribution] ceiling applies regardless of whether the contribution is given to the candidate, to a committee authorized in writing by the candidate to accept contributions on his behalf, *or indirectly via earmarked gifts passed through an intermediary to the candidate.*") (emphasis added); *United States v. Goland,* 959 F.2d 1449, 1452 (9th Cir.1992) (following *Buckley* and concluding that the defendant made a contribution to a candidate when he made it indirectly, through an intermediary).

¶ 36 Similarly, in *Colorado Education Association v. Rutt,* 184 P.3d 65, 80–81 (Colo. 2008), our supreme court recognized, albeit in dicta, that when a union organized walks by union members to distribute campaign literature in support of a state senate candidate, the candidate's campaign may well have indirectly received value from the union's activities (i.e., because the union effectively operated as the candidate's volunteer coordinator, thus relieving the candidate from having to pay for such services himself). The court added that as a factual or evidentiary matter, the existence of some level of communication or cooperation between the union and the candidate would help demonstrate that the alleged contribution resulted in a benefit or value to the candidate. *Id.* at 81.

¶ 37 And in a different context, the Internal Revenue Service's income tax regulations illustrate an indirect gift as follows:

> If a taxpayer makes a gift to a corporation or other business entity intended for the eventual personal use or benefit of an individual who is an employee, stockholder, or other owner of the corporation or business entity, the gift generally will be considered as made indirectly to such individual.

26 C.F.R. § 1.274–3(e)(2) (2014).

¶ 38 We cite these sources, which we view to be consistent with the plain meaning of the term "indirectly," as illustrative only. For purposes here, we need not develop an all-encompassing definition of the word "indirectly," as that term is used in the applicable definition of a "contribution." Rather, applying the plain meaning of the terms used in the present context, we need only note that

indirectly giving something of value to a candidate must, at a minimum, involve providing something of value to someone other than the candidate himself or herself but with the intention that the candidate will eventually receive or make use of that thing of value.

▇ ¶ 39 Accordingly, in our view, the phrase "given, directly or indirectly, to a candidate for the purpose of promoting the candidate's ... election" requires that (1) a thing of value (2) be put into the possession of or provided to a candidate or someone acting on the candidate's behalf (3) with the intention that the candidate receive or make use of the thing of value provided (4) in order to promote the candidate's election. The candidate need not, however, personally receive and accept the thing of value, as the District contends. On this point, we agree with the contentions of amicus curiae, Colorado Ethics Watch, that such a requirement is unsupported by the constitutional definition of "contribution" and would arguably read the word "indirectly" out of that definition, which we cannot do. *See Rodriguez*, 112 P.3d at 697; *In re Great Outdoors Colo. Trust Fund*, 913 P.2d at 542.

▇ ¶ 40 Applying the foregoing definition here, we conclude that the evidence does not support the ALJ's conclusion that the Hess Report was given, directly or indirectly, to a candidate for the purpose of promoting that candidate's election. Although the Hess Report was distributed by way of an e-mail link to 85,000 Douglas County residents, such a mass distribution was insufficient to establish that the District put the Hess Report into the possession of, or otherwise provided it to, any candidate or someone acting on behalf of a candidate. Nor have we seen any evidence to support a conclusion that the District made the distribution with the intention that a particular candidate would eventually receive or make use of the Hess Report.

¶ 41 In reaching this conclusion, we note that we are relying on our view that the ALJ applied an incorrect legal standard. We have not failed to consider the ALJ's factual findings, as the dissent contends. In addition, we acknowledge that one could read the Hess Report as favorable to the reform agenda and therefore conclude that the Hess Report's mass distribution might have provided an *incidental benefit* to a pro-reform candidate. Concluding that such an incidental benefit was sufficient to establish a "contribution," however, would stretch the meaning of "given, directly or indirectly, to a candidate for the purpose of promoting the candidate's ... election" too far. *Cf. City & Cnty. of Broomfield*, 203 P.3d at 625 (rejecting the plaintiff's argument that "for the purpose of" in section 2(5)(a)(IV) of article XXVIII of the Colorado Constitution should be construed to mean "with the effect of").

▇ ¶ 42 We are not persuaded otherwise by Keim's argument that, under 8 Colo. Code Regs. 1505–6:10.3.1(d) (2014), the Hess Report was given to the candidates because they had the right to possess or use it. Notwithstanding Keim's suggestion to the contrary, regulation 1505–6:10.3.1(d) does not provide a definition of "contribution." Rather, it assumes the existence of a contribution and defines the date on which that contribution was made or received. *See id.* Accordingly, this regulation is inapposite.

¶ 43 Moreover, Keim's suggestion that a contribution is made whenever a candidate has a right to possess or use something of value is overbroad. Under such an interpretation, one could argue that a contribution is made any time a local government uses public resources to post on the Internet information that might potentially benefit a candidate, simply because the candidate could download and use that information. In our view, adopting such an interpretation would ignore the plain meaning of the phrase "given, directly or indirectly, to a candidate" and could lead to absurd or unreasonable results, which we cannot countenance. *See Huber*, 264 P.3d at 889 (noting that we avoid interpretations that lead to unjust, absurd, or unreasonable results); *Harwood*, 141 P.3d at 964 (noting that we read the words of a constitutional provision in context and accord them their plain and ordinary meanings).

¶ 44 Accordingly, we conclude that the record does not support Keim's argument, or the ALJ's finding, that in contracting for and disseminating the Hess Report, the District made a "contribution" in a campaign involv-

ing the election of a person to public office, in violation of the FCPA.

## IV. Other Issues

¶ 45 In light of our foregoing disposition, we need not address the District's various policy and First Amendment arguments.

## V. Conclusion

¶ 46 For these reasons, the order is reversed.

JUDGE BOORAS concurs.

JUDGE TAUBMAN dissents.

JUDGE TAUBMAN dissenting.

¶ 47 Because I agree with the final agency decision of an administrative law judge (ALJ) that the respondent, Douglas County School District (the District), violated Colorado's Fair Campaign Practices Act (FCPA), § 1-45-117(1)(a)(II), C.R.S. 2014, when it contracted for and disseminated a report written by the American Enterprise Institute (the Hess Report), I respectfully dissent. Unlike the majority, I conclude that the Hess Report was given, directly or indirectly, to reform school board candidates for the Douglas County School Board election in 2013.

¶ 48 Therefore, I conclude that the dissemination of the Hess Report constituted a contribution under the FCPA and that the ALJ properly concluded that the dissemination of the Hess Report was improper.

## I. Background

¶ 49 Petitioner, Julie Keim, ran for a position on the Douglas County School Board in 2013 as an opponent of the so-called reform agenda. She alleges that the District, in violation of the FCPA, used public funds to commission a politically conservative organization to prepare a white paper (the Hess Report) supporting her political opponents and undermining her campaign.

¶ 50 After a two-day hearing, an ALJ agreed with Keim, finding that the District used public funds to influence the school board election when it commissioned the Hess Report. The ALJ supported her conclusion with the following extensive findings

of fact, supported by substantial evidence in the record.

¶ 51 First, the ALJ found that the District's reform agenda "is known as being politically conservative," and that it sought to further principles of school choice for children in the District, which allowed tuition credits to be applied at participating private schools and promoted pay for performance for school teachers. The ALJ further found that the District contracted for the preparation of the Hess Report with the American Enterprise Institute (AEI), "known as a politically conservative organization."

¶ 52 Second, the ALJ relied on correspondence between the Hess Report authors and District officials. One of the drafters e-mailed the District's communications director stating that "[AEI] would love for [the District] to help us help you," asking the District "what you'd like to see written about and what your general angle on it (and the paper) is." Later in the e-mail, the Hess Report author asked the District for a list of individuals that he could interview to achieve the District's desired goals regarding the report.

¶ 53 In another correspondence, one Hess Report author contacted the District to request a quotation from the superintendent to include in an op-ed column to appear in the National Review Online. In the e-mail, the author explained that the quote would follow the sentence: "This fall, four of the school board's seven members are up for election, and the Douglas County Federation of Teachers would dearly love to sweep them out and claim the board majority." Although the superintendent did not provide the requested quote, the school board president did. His quote, which appeared in a September 17, 2013, National Review Online article, stated:

The teacher's union would like to return to the days of big payouts for union officers, ... ending choice for students, and rewarding bad performance. This election presents a clear choice between union interests versus what is best for our students.

¶ 54 Third, the ALJ found that the District e-mailed a link to the Hess Report, as well as

a brief summary of it, to the 85,000 recipients of its weekly newsletter, including the parents of school children in the District, as well as others on the school district's distribution list. The newsletter noted that the Hess Report focused on Douglas County reforms, including choice and pay for performance.

¶ 55 Fourth, the ALJ made several findings regarding the contents of the Hess Report. She noted that the Hess Report referred to the reform agenda as "unusually ambitious," "remarkable," "bold," and "illuminating," and referred to pro-reform agenda board members and candidates as "cage-busting leaders," concluding that overall, the report "painted a positive picture of the reform agenda."

¶ 56 Fifth, the ALJ noted that the Hess Report specifically mentioned that four board members were up for re-election in the coming election, and a sidebar contained a profile of each board member. The report then touted the benefits of having a unified board of reform agenda candidates:

> Fueled by a unified board with a coherent vision and a bold superintendent and granted the leeway provided by a record high performance, [Douglas County] is serving as the site of what may well prove to be a critical chapter in the story of contemporary school reform, and the nation should pay close attention.

¶ 57 Although the ALJ found that the Hess Report's authors spoke with about a dozen individuals not recommended to them by the District and discussed some concerns raised by what were described as "skeptics" of the reform agenda, she also noted that "[f]or almost every criticism or concern raised, the Hess Report provides the District's reasons as to why those concerns and criticisms are unfounded."

¶ 58 Accordingly, the ALJ concluded "that the Hess Report was commissioned and published as a means to support the reform agenda and any candidates who would further that agenda." The ALJ further found that the District spent public funds to influence the outcome of the board election when it commissioned and paid $15,000 for the Hess Report.

¶ 59 The ALJ also concluded that even though there were no school board candidates when the District commissioned the Hess Report, by the time it was released and disseminated in September 2013, "all of the candidates, including the reform slate candidates, had announced their candidacies." Thus, the ALJ concluded, "even if the reform slate candidates had not received a contribution or made an expenditure in support of their candidacies on that date, each of them received a contribution when the District sent the link to the Hess Report to 85,000 people, many of whom would be voters in the November 2013 election."

¶ 60 Accordingly, the ALJ found that the District violated the FCPA when it disseminated the report by e-mail on September 18, 2013. Because Keim did not request that a fine be imposed against the District, the ALJ did not impose one.

## II. Standard of Review

¶ 61 I agree with the majority that judicial review of agency action is reviewed under section 24–4–106(7), C.R.S. 2014, and that, as a reviewing court, we must defer to the reasonable statutory interpretations of an administrative agency authorized to enforce a particular statute. *See Bd. of Cnty. Comm'rs v. Colo. Pub. Util. Comm'n*, 157 P.3d 1083, 1088 (Colo.2007); *Colo. Ethics Watch v. City & Cnty. of Broomfield*, 203 P.3d 623, 624 (Colo.App.2009). I also agree that an agency's statutory construction is not binding on an appellate court.

¶ 62 Further, I agree with the majority that in construing a constitutional provision, we must give effect to the intent of the electorate that adopted it. *See Colo. Ethics Watch v. Senate Majority Fund, LLC*, 2012 CO 12, ¶ 20, 269 P.3d 1248, 1253.

¶ 63 Finally, I agree with the majority's stated principles of interpretation of constitutional provisions. However, I disagree with the majority's interpretation of the FCPA and the Colorado Constitution, which results in it not considering the ALJ's well-supported factual findings.

### III. Preliminary Matters

¶ 64 I note at the outset that I agree with the majority that (1) the District paid for the Hess Report with public funds or resources, as the ALJ found; (2) article 28, section 2(5)(a)(II) of the Colorado Constitution does not apply to this case; and (3) the District's appellate briefs are unnecessarily strident for the reasons set forth by the majority.

### IV. "Direct" and "Indirect" Contributions

¶ 65 I begin with the premise that the FCPA prohibits governmental entities, including the District, from making campaign contributions. § 1–45–117(1)(a)(I). Further, "contribution" is defined as "anything of value given, directly or indirectly, to a candidate for the purpose of promoting the candidate's ... election." Colo. Const. art. XXVIII, § 2(5)(a)(IV); § 1–45–117(1)(a)(I).

¶ 66 I disagree with the majority's conclusion, supported by federal law, that an indirect campaign contribution necessarily requires that something of value be placed in the possession of a third party.

¶ 67 The majority concludes that an "indirect campaign contribution" cannot occur unless the contributing party first places a thing of value into the possession of a third party. It supports its definition of an "indirect contribution" with reference to a federal campaign finance statute and an Internal Revenue Service regulation. See 52 U.S.C.A. § 30116(a)(8) (West 2014); 26 C.F.R. § 1.274–3(e)(2) (2014). Relying on these authorities, it concludes that an indirect contribution must, at a minimum, involve "providing something of value to someone other than the candidate ... with the intention that the candidates will eventually receive or make use of that thing of value."

¶ 68 In my view, this proposed definition is inconsistent with the rule of statutory construction that "the interpretation of one statute by reference to an unrelated statute is an unreliable means of ascertaining legislative intent." See Bertrand v. Bd. of Cnty. Comm'rs, 872 P.2d 223, 228 (Colo.1994), superseded by statute as stated in Henderson v. City & Cnty. of Denver, 2012 COA 152, ¶ 33, 300 P.3d 977, 981; Colucci v. Town of Vail, 232 P.3d 218, 220 (Colo.App.2009); Goodwin v. Thieman, 74 P.3d 526, 528 (Colo. App.2003).

¶ 69 Nothing in the statutory or constitutional definitions of "indirect contribution" that we are considering here requires the presence of an intermediary or conduit. Similarly, the definition of "contribution" in the FCPA does not involve a taxpayer making a gift to a corporation or other business entity. Rather, the definition of "contribution," as discussed above, is merely "anything of value given, directly or indirectly to a candidate for the purpose of promoting the candidate's nomination, retention, recall, or election." Thus, such a contribution need not be made through an intermediary or conduit, or involve a gift to a corporation or other business entity intended for the eventual personal use or benefit of an individual who is an employee, stockholder, or other owner of a corporation or business entity.

¶ 70 This conclusion is supported by the dictionary definition of "indirect." Our courts frequently apply dictionary definitions to determine the plain and ordinary meaning of words not expressly defined by statute. See, e.g., Tidwell in the Interest of Tidwell v. City & Cnty. of Denver, 83 P.3d 75, 82 (Colo. 2003); Fogg v. Macaluso, 892 P.2d 271, 274 (Colo.1995).

¶ 71 As relevant here, the word "indirect" has various dictionary definitions, including "deviating from a direct line or course; not proceeding straight from one point to another." Webster's Third New Int'l Dictionary 1151 (2002). It also means "not going straight to the point: not proceeding to an intended end by the most direct course or method." Id. These definitions do not require the presence of an intermediary.

¶ 72 Accordingly, I disagree with the majority's definition of the phrase "given ... indirectly, to a candidate for the purpose of promoting the candidate's ... election" to the extent that it requires that something of value must be given to someone acting on the candidate's behalf. That requirement is not contained in the statutory definition.

¶ 73 Instead, I would apply the dictionary definitions of "indirect" and conclude that the

District indirectly contributed to the election of reform school board candidates when it e-mailed the Hess Report to 85,000 recipients in September 2013. In so doing, the District contributed to the reform candidate's election by "not proceeding straight from one point to another" and "not proceeding to an intended end by the most direct course or method." That is precisely what the ALJ found, in concluding that "the District violated the Colorado FCPA when it sent the Hess Report, for which it had paid $15,000 by e-mail on September 18, 2013."

## V. Applying the Majority's Framework

¶ 74 Next, I disagree with the majority's application of its own proposed definition of indirect contribution. The majority concludes that the ALJ's factual findings do not support the ALJ's conclusion that the Hess Report was given "directly or indirectly" to a candidate for the purpose of promoting that candidate's election. I would conclude that the evidence supports the ALJ's determination that the Hess Report was given "directly or indirectly" to a candidate for the purpose of promoting that candidate's election.

¶ 75 As noted, the majority holds that "given, directly or indirectly, to a candidate for the purpose of promoting the candidate's ... election" requires that (1) a thing of value (2) be put into the possession of or provided to a candidate or someone acting on the candidate's behalf (3) with the intention that the candidate receive or make use of the thing of value (4) in order to promote the candidate's election.

¶ 76 As the majority concludes, the school district paid $15,000 to AEI, an entity which the ALJ found to be working on behalf of reform candidates, for the preparation of the Hess Report. As the ALJ found, the District then coordinated with AEI to ensure that the Hess Report was as beneficial as possible to promote the reform agenda and pro-reform agenda candidates.

¶ 77 The resulting Hess Report specifically mentioned that four school board members were up for re-election in the coming election and recognized the benefits of having a unified board to advance the reform agenda.

¶ 78 While the majority concludes that the distribution of the Hess Report by an e-mail link to 85,000 Douglas County residents was insufficient to establish that the District put the Hess Report into the possession of, or otherwise provided it to, any candidate or someone acting on behalf of the candidate, the ALJ made a factual finding that the Hess Report was prepared and disseminated for that very purpose. Further, applying the majority's own definition of an "indirect contribution," I conclude the District violated the FCPA once it paid AEI $15,000 in public funds for a report promoting the candidacies of pro-reform agenda candidates.

¶ 79 The ALJ specifically found that the Hess Report was published to support the reform agenda and the pro-reform agenda candidates running for the school board in the November 2013 election. Thus, the ALJ's findings, to which we must defer, fully support the conclusion that the District made a contribution in violation of the FCPA.

¶ 80 The majority concedes that the Hess Report could be considered to have provided an incidental benefit to a pro-reform candidate, but nevertheless concludes that interpreting such incidental benefit to constitute a contribution stretches the meaning of the definition of contribution too far. However, the contribution here was significant, and the benefit conveyed by the District to the reform candidates was not merely incidental. The District contributed $15,000 of public funds for the preparation of a report supporting only the efforts of pro-reform agenda candidates, which it then disseminated by e-mail to the parents of school children throughout the District.

¶ 81 I also note that to the extent the evidence before the ALJ could be interpreted as conflicting regarding the District's intent to make an indirect contribution, no First Amendment consideration would lead to the conclusion here that "the tie goes to the speaker rather than to censorship and regulation." *Colo. Educ. Ass'n v. Rutt*, 184 P.3d 65, 70 (Colo.2008)

¶ 82 I disagree with the majority's conclusion that the District's conduct, which involved a governmental entity paying a third party public funds with the intent to support

one candidate in an election to the detriment of another did not constitute a contribution under the FCPA. To conclude that such a contribution was insignificant would be inconsistent with the Colorado Constitution, as well as the spirit and purpose of the FCPA. *See* Colo. Const. art. XXVIII, § 1 ("The people of the state of Colorado hereby find and declare that large campaign contributions to political candidates create the potential for corruption and the appearance of corruption...."); § 1–45–102, C.R.S.2014 ("The people of the state of Colorado hereby find and declare that large campaign contributions ... create the potential for corruption and appearance of corruption.").

## VI. The District's Other Arguments

¶ 83 Because I disagree with the majority, I will briefly address and reject additional arguments raised by the District.

¶ 84 First, the majority concedes, contrary to the District's briefs on appeal, that public funds were used to pay for the Hess Report.

¶ 85 Second, I reject the District's contention that there was no evidence that the Hess Report added any value to any candidates. To me, it is undisputed that the dissemination of a report shortly before the election praising the reform agenda to 85,000 residents in Douglas County would benefit the school board's reform candidates.[1]

¶ 86 I also disagree with the District's contention that nothing was "given" to a candidate. Under the definition of contribution, something may be given either directly or indirectly. As the ALJ found, the Hess Report was given indirectly to the Douglas County School Board reform candidates when it was e-mailed to 85,000 residents of Douglas County for the specific purpose of promoting the election of those candidates.

¶ 87 Finally, I disagree with the District's contention that the Hess Report was not commissioned "for the purpose of" promoting the reform candidates. The ALJ concluded to the contrary, based on conflicting evidence

presented at a two-day hearing. The issue of a party's intent is viewed as a question of fact, *Nixon v. City & Cnty. of Denver*, 2014 COA 172, ¶ 31, 343 P.3d 1051, 1058, and because the ALJ's conclusions regarding the District's intent are supported by evidence in the record, we must defer to the ALJ's conclusion that the District commissioned the Hess Report "for the purpose of" promoting the school board's reform candidates.

## VII. Ramifications of ALJ's Ruling

¶ 88 Finally, I am not persuaded by the District's assertion that a "parade of horribles" would ensue if the ALJ's decision were upheld. First, the District raises the specter that candidates could be found in violation of the FCPA if contributions were made on their behalf indirectly without the candidates even knowing it. This contention was expressly rejected by the Colorado Supreme Court in *Rutt*, 184 P.3d at 80–81. There, the supreme court rejected a similar argument, noting that the FCPA complaint in that case had been filed against a contributor, not against the candidate. The same is true here.

¶ 89 Second, the District asserts that the ALJ's ruling would chill the First Amendment rights of individual speakers and candidates, but concedes that the First Amendment has not been held to apply to governmental entities such as the District. *See, e.g., United States v. Am. Library Ass'n*, 539 U.S. 194, 211, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003).

¶ 90 Third, the District maintains that governmental entities will be chilled in providing communications to their constituents and cites as an example that Denver Mayor Michael B. Hancock could not promote his agenda of strong leadership and major accomplishments on the City and County of Denver website. The District argues that such conduct could be considered an illegal campaign contribution. This argument, however, ignores the importance of timing in

---

1. I note that the ALJ also rejected the District's argument that no direct or indirect contribution was made here because, when it entered into the contract with AEI, no candidate fit the definition of "candidate" under Article XXVIII. The ALJ

relied on a division of this court's rejection of a similar contention in *In re Petition of Skruch v. Highlands Ranch Metro. Dists. 3 & 4*, 107 P.3d 1140, 1145 (Colo. App. 2004).

connection with the dissemination of information to constituents. As the District acknowledges, Mayor Hancock's laudatory information was not posted on his website during an election year. Here, in contrast, the ALJ found that the District disseminated the Hess Report shortly before the school board election and that it was prepared with the express purpose of promoting the election of reform candidates to the school board.

## VIII. Conclusion

¶ 91 Accordingly, I would affirm the ALJ's conclusion that the District made a contribution to support the election of reform candidates to the school board in the 2013 election in violation of the FCPA.